**SACK & SACK, LLP**
*Attorneys for Plaintiffs*
70 East 55th Street, 10th Floor
New York, NY 10022
Tel.: (212) 702-9000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FREEMAN & CO., LLC and FREEMAN CAPITAL HOLDINGS, LLC, <br><br>         Plaintiffs, <br>    v. <br><br><br> TONY SETO, and BERKSHIRE CAPITAL SECURITIES, LLC, <br>         Defendants. | No.: 18-cv-_____ ( ) ( ) <br><br> **VERIFIED COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiffs, Freeman & Co., LLC and Freeman Capital Holdings, LLC ("*Freeman*," the "*Company*" or "*Plaintiffs*"), by and through its undersigned attorneys, Sack & Sack, LLP, alleges, for its Verified Complaint against its former Partner and employee, Defendant Tony Seto ("*Seto*"), and his current employer, Defendant Berkshire Capital Securities, LLC ("*Berkshire*") (together with Seto, the "*Defendants*"), as follows:

<u>**NATURE OF THE ACTION**</u>

1.     Freeman brings this action against its former Partner and employee, Tony Seto, in order to enjoin him from retaining, using, disseminating, and misappropriating Freeman's valuable and highly confidential trade secrets and other proprietary information, in breach of the written covenants he entered into with Freeman and in violation of his fiduciary duty of loyalty to Freeman.

2.     Among the allegations contained herein, Freeman alleges that Seto, in contemplation of his plan to suddenly resign his employment with the Company, uploaded

Freeman trade secrets from his work computer to his personal hard drives and cloud accounts. Even after he resigned his employment, Seto refused to return Freeman trade secrets in his possession. Accordingly, Freeman brings this action asserting claims against Seto under the Defend Trade Secrets Act ("*DTSA*"), 18 U.S.C. § 1836(b), and under New York state law for breach of contract, misappropriation, and breach of fiduciary duty / loyalty.

3.　　Freeman also brings this action against its direct competitor and Seto's current employer, Berkshire, for its role in aiding and abetting Seto in his unlawful actions by tortiously interfering with Freeman's covenants with Seto, unfairly competing, and aiding and abetting Seto's breaches of his fiduciary duties to Freeman.

## PARTIES

4.　　Freeman & Co., LLC, is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York. Freeman's business consists principally of providing independent financial services advice offering mergers and acquisitions and related advisory services, capital raising, underwriting, strategic management consulting and competitor benchmarking data analysis to the entire spectrum of financial institutions.

5.　　Freeman Capital Holdings, LLC, is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York, and is the holding company of Freeman and Co., LLC. Seto's ownership interest in the Company, pursuant to the Limited Liability Company Agreement, as described herein, was in Freeman Capital Holdings, LLC.

6.　　Upon information and belief, Seto is an individual who resides at 45 Park Avenue, Apartment 2003, New York, New York 10016.

7.      Until March 9, 2018, Seto was an employee and Partner of Freeman with access to Freeman's most valuable confidential information and trade secrets.

8.      As a Partner of Freeman, Seto owes a heightened fiduciary duty of loyalty to Freeman to act in the best interests of the Company and to his other Partners.

9.      Upon information and belief, Berkshire is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 535 Madison Avenue, 19th Floor, New York, New York 10022.

10.     Berkshire is a direct competitor of Freeman as it too is a boutique investment-banking firm that provides financial advisory services. Berkshire offers private placements, mergers and acquisitions, divestitures, strategic alliances, corporate finance advice, and valuation services to financial services companies. Berkshire caters to investment management firms, commercial banks, trust companies, securities and investment banking firms, and insurance companies, and is in direct competition with Freeman.

11.     Seto is currently employed by Berkshire and is performing investment banking and financial advisory services for Berkshire similar to those he provided for Freeman in breach of his agreements with Freeman, as more fully described herein.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §§ 1331 and 1367(a), this Court has original jurisdiction over the subject matter because a federal question is presented and all other claims are so closely related to the claim presenting a federal question that they form part of the same case or controversy.

13.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because Seto's and Berkshire's principal place of business is situated within this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

### SETO'S HIRING

14.     Freeman is engaged in the business of providing independent financial services advice offering mergers and acquisitions and related advisory services, capital raising, underwriting, strategic management consulting and competitive benchmarking data analysis to the entire spectrum of financial institutions.

15.     Freeman focuses exclusively on the financial services industry covering asset management, broker dealers, financial technology, specialty assets and funds, insurance and private equity.

16.     On January 23, 2017, Seto joined Freeman as a Partner and an employee in Freeman's New York office. Seto joined the Company as an Executive Director to Co-Head Freeman's Financial Technology Sector.

17.     Upon his hire, Seto was quoted in a press release admitting that, **"I am pleased to join Freeman & Co.'s highly respected platform. The firm's significant relationships in Financial Services complement my own and will provide my clients with greater resources and capabilities to maximize their shareholder objectives. I look forward to working with Chris Pedone who will continue to focus on the Financial Technology sector within Asset/Wealth Management and Trading/Capital Markets."**

18.    During the course of providing its services, and through the expenditure of substantial capital, Freeman has developed and maintained confidential information and trade secrets, including proprietary processes, research and development strategies, sales and marketing strategies, customer and target lists, business data, and best practices.

19.    Freeman derives substantial independent value from its confidential information not being known generally and not being ascertained readily by other persons and entities that could derive economic value from its disclosure or use.

20.    Freeman has made reasonable efforts to maintain the secrecy of such information in a number of ways, one of which is by requiring key employees to execute agreements containing confidentiality and non-solicitation clauses.

21.    Freeman has devoted considerable time, hard work and financial resources to advertise for, solicit, maintain and service its customers, and has enjoyed, *inter alia*, valuable customer goodwill and business growth as a result.

22.    Through its efforts, Freeman also has developed considerable knowledge concerning its customers and prospects that is not generally known to the public. Thus, in addition to confidential customer lists which reflect the identities of their customers, Freeman has collected detailed information that is specific to particular customers and/or clients and not readily available to others, such as the name, title, and position of the customer's and prospect's key contact personnel, their specific needs, preferences and concerns, existing and planned service offerings, marketing strategies, pricing and cost structures, and other specialized information that is useful in obtaining business and maintaining the customer / client's repeat business and goodwill.

23.     In particular, all employees, including Seto, who work on assignments involving broker-dealers, have access to an email group entitled, "Notes." Notes are detailed call reports that contain extensive and highly sensitive proprietary information gathered during prospective client/client interactions.

24.     Freeman also maintained other sources and resources of confidential information and trade secrets, including comprehensive databases such as Salesforce (the "*Salesforce database*"), FinTech Database, and the Allocator Database that contain, among other confidential information, the identities, preferences, assets and strategies of Freeman's actual and potential clients.

25.     During the course of Seto's employment with Freeman, he was given access to this confidential information, Freeman trade secrets, and other proprietary information, including confidential internal strategic information, confidential investor information, and other confidential information related to Freeman's business.

26.     **Salesforce Database:** Salesforce.com is a web-based customer relationship management system that contains the Company's customer information including contact information, individual contact names, and call notes associated with each account. Salesforce is password-protected and is accessible to only certain senior-level Company employees.

27.     Freeman's Salesforce database contains a wealth of valuable and proprietary information about Freeman's business that is non-public and could not be obtained anywhere else.

28.     For example, it contains details concerning every open sales opportunity that the Company is pursuing including, but not limited to, sales lead information such as the name(s) of current and prospective clients, call notes, client investment preferences, strategic business

issues, detailed financial data pertaining to the client, and relevant follow-up work to be performed.

29.     In short, the Salesforce database is a road map to the Company's future business, and it contains a wealth of confidential and proprietary sales information — all of which was made available to Seto on the express condition he abide by the numerous covenants to keep confidential the information he became privy to from Salesforce and other confidential databases belonging to Freeman.

30.     The Company uses the Salesforce database to store its most competitively sensitive information, including client and prospective client contact information, investment preferences, strategic business options, key financial data, and proprietary client categorization, prioritization, and ranking, none of which information is publically known or otherwise available.

31.     **FinTech Database:** contains a list of all the companies in Freeman's Salesforce system along with proprietary categorization and relationship details. The FinTech Deals Database includes the history of all FinTech related transactions along with the same proprietary categorization as well as rankings and prioritization.

32.     **The Allocator Database:** contains a proprietary list of all Freeman's global institutional investor relationships, along with management relationships, contact information, strategic priorities and direct feedback from past investment opportunities for each relationship. This list of nearly 250 institutional relationships was compiled over many years and included insurers, OCIOs, fund-of-fund managers, alternative and traditional asset managers, high-net-worth individuals/family offices, wealth managers, banks, endowments and foundations.

33.     Company databases (such as Salesforce.com, the FinTech Database, and the Allocator Database) are protected by multiple layers of security and are accessible only to those employees who have received special authorization and login credentials.

34.     All customers and other outside entities who are permitted to access the Company's confidential information are required to execute a non-disclosure agreement mandating that the information be maintained as confidential.

35.     Similarly, through written contracts with its client, Freeman is subject to confidentiality restrictions with clients, the breach of which could subject Freeman to considerable damage.  Even the mere fact that Freeman is providing services is considered confidential information by some clients, and Freeman is contractually obligated to protect its confidentiality.  Details of a specific client engagement can be highly sensitive and confidential to both the client and Freeman.

36.     Accordingly, the customer lists and related customer information constitute valuable and unique assets of Freeman that have been developed painstakingly and at substantial expense, and which Freeman carefully seeks to protect.  Moreover, such valuable and unique assets are considered "trade secrets" belonging to Freeman because (i) Freeman derives independent economic value from them not being generally known and (ii) Freeman took significant and reasonable measures to keep them secret.

37.     Seto was one of only a handful of Freeman employees given access to Freeman's entire Salesforce database.

38.     It is critical to Freeman that it preserve its means of successfully competing in the professional service business by, *inter alia*, providing efficient and quality service to its

customers, maintaining customer goodwill, and developing business methods and processes that differentiate Freeman from its competitors in the marketplace.

39. The confidential customer information that was shared with Seto as a necessity of his role has been carefully accumulated and preserved throughout the years and is essential to this goal.

40. As explained in greater detail below, rather than spending its own time, money and effort to hire and train quality employees to build up its business on its own, Defendant Berkshire, in concert with Seto, formerly Freeman's Co-Head of its Financial Technology Sector, seeks to violate Freeman's legal rights by having Seto violate his restrictive covenants with Freeman by using the confidential information and relationships Seto learned during his Freeman employment to pirate away the clients and prospects that Freeman spent significant time, money, and hard work identifying and establishing relationships with.

41. Such conduct is unlawful and violates Freeman's rights.

**SETO'S AGREEMENTS GOVERNING RESTRICTIVE COVENANTS**

42. Freeman entrusted Seto with access to extremely valuable confidential and proprietary information and trade secrets including information contained in Notes and in the Salesforce Database for the sole purpose of performing his job duties.

43. Seto was entrusted with other highly sensitive and confidential information concerning Freeman's business, prospects, customers, employees, and prices related to Freeman's financial services in order to perform his essential duties.

44. Such information includes sales pitches, statement-of-work and other contract forms, pricing models and amounts, standard operating procedures for project management services, Salesforce.com contacts and prior work data.

45. Seto understood that the information provided to him, if improperly disseminated, was capable of harming Freeman's business, including by depriving the company of its competitive advantage and by damaging Freeman's position and credibility in the marketplace.

46. Accordingly, given the confidential, proprietary and trade secret information that Freeman provided to Seto during his tenure, Freeman required Seto to execute certain agreements as a condition of his partnership and employment with Freeman.

47. When Seto accepted his offer of employment with Freeman, in exchange for the benefit of significant compensation, Seto executed Freeman's Limited Liability Company Agreement (the "*Partnership Agreement*," Ex. A).

48. Among the covenants set forth in the Partnership Agreement, Seto agreed to, among other things, non-competition and non-solicitation restrictive covenants that provided the following:

> "**Non-Competition.** A Member shall not, while it is a Member of the Company and for ninety (90) days after its membership is terminated for any reason, directly or indirectly, in any form or manner, participate in activities which are competitive with the business of the Company, or have a monetary interest in or invest capital in any business or enterprise in any field in competition with the Company, wherever located, whether such interest be by way of (i) ownership, (ii) stock interest, (iii) financing or (iv) lending arrangements or in any other form or of any other nature. Upon being admitted as a Member and during the term of such Member's membership with the Company, Members shall disclose to the Company any stock owned, or other interest held, by the Member and the Member's affiliates or members of the Member's family, as applicable, in any business (regardless of the form thereof) competitive with the Company. Notwithstanding the foregoing, no Member shall be prohibited from investing in any competitive business, as aforesaid, the capital stock of which is publicly traded so long as the Member's and the Member's affiliates' or the Member's family's ownership, as applicable, collectively does not represent more than ten percent of all outstanding shares of capital stock of such business and is for investment purposes only. A Member shall disclose the obligations created by this Section 13.3 to any subsequent employer."

(See, Ex. A, § 13.3).

**Non-Solicitation**. A Member shall not, while it is a Member of the Company and for six (6) months after its membership is terminated for any reason: (ii) directly or indirectly, attempt to influence, persuade or induce any client of the Company to (A) terminate its contract with the Company, (B) refrain from entering into a new contract with the Company or (C) enter into any contract with any competitor of the Company.

(See, Ex. A, § 13.4(ii)).

49.     By executing the Partnership Agreement, Seto also agreed that during his employment, and after the termination thereof, he would preserve and maintain the secrecy of Freeman's confidential information.

50.     Section 13.1 of the Partnership Agreement, in relevant part, provides the following:

**No Disclosure.** Each party acknowledges that all information relating to the business and operations of the other party and the other party's Affiliates which it learns during the Term, or has learned during negotiation, of this Agreement (hereinafter referred to as "**Confidential Data**") are valuable property of such entities. Each party acknowledges the need to preserve the confidentiality and secrecy of the Confidential Data and agrees that, both during the Term and after the termination thereof, such party shall not use (except as required to fulfill the provisions of this Agreement during the Term), or disclose the same, and such party shall take all necessary steps to ensure that use by such party or by its employees or other authorized designees (which use and which appointment of designees shall be solely as necessary for, and in connection with, the Business) shall preserve in all respects such confidentiality and secrecy. The obligations under this Article 13 are in addition to any obligations under separate confidentiality agreements.

(See, Ex. A, § 13.1).

51.     Furthermore, prior to his hire at Freeman, on or about January 19, 2017, Seto entered into and executed a non-disclosure agreement with Freeman (the "*NDA*," Ex. B), under which he acknowledged his access to Freeman's confidential and proprietary information and

agreed to not divulge such information to anyone for his own benefit, or for the benefit of any

entity engaged in the same business.

52.     The NDA, in relevant part, provides the following:

> In consideration of my employment, or the continuation of my employment, as the case may be, by Freeman & Co. LLC, a Delaware limited liability company ("Company"), in which capacity I have or shall have access to confidential data, sales methods and techniques, customers, lists and information with respect to such customers, it being understood that such data, methods, techniques, fists and information are or will be furnished or available to me only by reason of such employment and my execution of this agreement and in consideration of the salary or wages to be paid me for such employment and intending to be legally bound hereby, ***I agree that during the term of my employment and for a period of twelve (12) months after the termination of my employment for any cause whatsoever,***

> I shall not, except within the scope of my employment by or with the prior written consent of Company, ***communicate, disclose or divulge to any person or entity whatsoever nor use for my own benefit, or for the benefit of any person or entity engaged in the same business as Company or any other business in competition with Company, any and all knowledge or infom1ation which may have been received by me in the course of my employmen***t, no matter from whom or in what manner I may have acquired such knowledge or information, with respect to the conduct and details of the businesses conducted by Company, ***including, but not restricted to, Company's business methods, techniques, processes, forms, statistics, credit, customers and sources of deal flow.***

> (See, Ex. B § 1) (emphasis added).

53.     Seto recognized and agreed that any violation of the NDA would result in

irreparable injury for which money damages could not adequately compensate the Company, and

that, in case of such violation, Freeman would therefore be entitled to an injunction:

> Recognizing and agreeing that any violation or breach by me of the covenants and agreements contained herein would result in irreparable injury to Company for which money damages could not adequately compensate Company, I agree that in the event of any such violation or breach by me, Company shall be entitled (in addition to any other rights and remedies which may have in law or in equity) to have an injunction issued by any competent court of equity enjoining and restraining me and/or any

other person or entity involved therein from continuing such violation or breach. I further agree that the existence of any claim or cause of action which I may have against Company or any other person or entity shall not constitute a defense to the enforcement of the covenants and agreements contained herein.

(See, Ex. B § 4).

54.     Based upon the terms of the agreements, Seto's relationship to Freeman's confidential and proprietary information and trade secrets is one of mere "access".

55.     As described herein, Seto unequivocally violated the clear and express terms of the Partnership Agreement and NDA he entered into with Freeman and he did so purposefully, with mal-intent and with impunity in an effort to gain a competitive advantage over Freeman and his former Partners.

**SETO VOLUNTARILY ABANDONED HIS EMPLOYMENT WITH FREEMAN**

56.     On or about March 9, 2018, Seto informed the Company that he intended to resign from Freeman, "effective immediately," to join Berkshire, a direct competitor of Freeman.

57.     Indeed, Seto commenced employment with Berkshire on or about March 12, 2018, just three days after his sudden resignation; demonstrating a well thought out scheme to pirate Freeman's clients, confidential information, proprietary information, and trade secrets over to Berkshire.

58.     Prior to and after his resignation from Freeman, Seto engaged in efforts to shop Freeman's clients, leads, and other confidential information to the Company's direct competitors and to assist those competitors in soliciting and diverting the Company's existing and prospective business opportunities in order to enrich himself to the detriment of the Company.

59. Upon information and belief, Berkshire knew of Seto's contractual obligations to Freeman and assisted, aided and abetted Seto in his breaches of those agreements as well as his breach of his fiduciary duty to Freeman and its partners.

<strong><u>FAITHLESS SERVANT SETO SOLICITS AWAY CLIENT BUSINESS</u></strong>

60. Freeman recently discovered that Seto's unlawful activity began *months* before his actual resignation, when Seto solicited *and actually worked on* client engagements for his own benefit and the benefit of Berkshire and to the detriment of Freeman in breach of his agreements with Freeman and in breach of his fiduciary duties while still employed at Freeman and using Freeman's valuable resources and offices.

61. Following Seto's sudden resignation, Freeman began to learn that Seto had begun calling on a number of Freeman clients and soliciting away their business towards Berkshire while Freeman was paying Seto significant compensation, including a base salary of $250,000.

62. Specifically, subsequent to his March 9th resignation, the Company discovered several documents and information confirming that Seto had been working secretly to solicit away a particular client (and deal) known as client VI.

63. For example, Freeman uncovered a spreadsheet Seto left behind at his desk, dated February 1, 2018, *six (6) weeks* before his resignation. On it, Seto indicated that he had an engagement letter agreed to with Client VI, which Seto noted has a probability of engaging at 100%, an estimated fee of $2,250,000, and a notation "awaiting me to land at new platform". (See, Exs. C and D).

64. In other documentation (*i.e.*, email communications between Seto and Freeman's Client VI dated February 12 and 13 respectively), Seto exchanged detailed financial information including, but not limited to, items such as financial statement projections, unclaimed rewards

liability, and vendor drawdowns. This level of detailed financial information is typically shared only in conjunction with an active assignment. (See, Ex. E).

65.     Seto's secretive communication with Client VI was in direct contravention to the express representations he purposefully reported to his Freeman Partners in order to deceive them in furtherance of his surreptitious acts.

66.     No one else on the Freeman deal team was copied on any of these emails. Typically, a deal team would include the junior team assigned to cover the client, as well as the partner. Seto had previously communicated to his fellow Partners that this deal was "dead" and not moving forward. Meanwhile, Seto was actively working on the financial diligence related to this client for his own benefit and for the benefit of Berkshire – all during his employment as a Partner at Freeman.

67.     In addition to the "VI" deal, Seto's February 1, 2018 spreadsheet contains another transaction that he indicates has a 100% probability of engaging, with an estimated fee of $2.5 million (code name "CN").  Specifically, Seto's spreadsheet states, "Board and CEO have asked for engagement letter."  (See, Ex. C.)

68.     Seto's spreadsheet also lists four other firms as "would like to engage," that Seto solicited during employment at Freeman, as well as two top clients of Freeman as "awaiting me to land at new platform."

**FREEMAN WILL SUFFER FROM INEVITABLE DISCLOSURE**

69.     In furtherance of Seto's serial efforts to use Freeman's assets, resources, personnel, and good will for his own benefit, even after Seto planned to resign from Freeman, join a competitor, and brazenly raid Freeman of deals that would have otherwise been closed by the Company, Seto attended confidential weekly Monday morning meetings, where all

employees were present, and monthly Partner meetings, where his fellow Partners were present, during both of which Seto became intimately familiar with the Company's entire pipeline and the status of its deal flow as well as current and imminent transactional business.

70.    Additionally, during his employment, Seto attended meetings of Freeman's New Business Committee, which reviewed all potential new clients for the Company, as well as proprietary pricing, positioning, and strategic information.

71.    It is important to note that, after receiving a notice of resignation of employment from a current employee, Freeman immediately terminates the employee's access to their computers and email systems.

72.    An employee accessing any of Freeman's systems after Freeman terminates their access is not only improper, but also illegal.

73.    When Seto resigned from Freeman, he took with him some or all of the information in Freeman's proprietary Fin Tech Database, Allocator Database, and Salesforce database, including at least two lengthy printouts of highly valuable Freeman client information generated from these databases.

74.    Specifically, on February 27, 2018, ten (10) days before he resigned, Seto emailed the Company's FinTech database to himself with a cover note to **"do this from home tonight."**

75.    This confidential and proprietary database has considerable economic value and was built at considerable cost to, and was and is owned solely by, the Company.

76.    Seto and/or Berkshire is not entitled to possess this highly valuable and confidential information, and Seto's Partnership Agreement and NDA expressly prohibit Seto from divulging such information.

77.     Additionally, and perhaps most egregiously, since resigning from Freeman on March 9, 2018, Seto has been remotely and illegally accessing Freeman's confidential information through Salesforce. (See, Ex. F). Specifically, the electronic login history for Freeman's Salesforce system indicates that Seto logged into Freeman's proprietary system on the following dates after his employment: (1) March 13, 2018 (4 times); (2) March 14, 2018; (3) March 15, 2018 (twice), (4) March 16, 2018 (twice); (5) March 19, 2018 (twice); and (6) March 20, 2018.

78.     As a consequence of Seto's actions of accessing Freeman's confidential information while employed at Berkshire, disclosure of such information to Berkshire is legally inevitable in violation of Seto's agreements restricting him from competing and misappropriating trade secrets.

79.     Access to the proprietary information and trade secrets Seto misappropriated from Freeman would give Berkshire a tremendous unfair advantage in the investment banking and financial advisory business.

80.     This is because:

A.     Freeman is a boutique investment bank and advisory firm. Freeman's client base has particularly targeted small-to-medium size financial services clients across asset management, brokers dealers, financial technology, specialty assets and funds, insurance and private equity.

B.     Berkshire is a boutique investment bank and advisory firm as well and works in direct competition with Freeman. Berkshire will inevitably target smaller to medium size financial services clients as well – Freeman's target market.

C.      Investment banking and advisory is a service business. Knowledge of a client's particular need is critical and quite costly to develop. Such knowledge is very valuable in convincing a potential client to engage a banker, and it normally takes years and millions of dollars to develop an extensive client and prospective-client database such as Freeman's.

D.      Merely identifying potential investment banking and advisory clients and the relevant contact people is difficult and expensive. Many of the clients and targeted clients are private companies and such information is not widely available. Further, they do not include key information that is in Freeman's Salesforce database about such matters as, e.g., personnel who will be important in banker selection and particular client needs and preferences.

E.      Freeman negotiates pricing with its clients individually. Knowing the price each client is paying Freeman would allow Berkshire to target Freeman's most profitable clients. It would also allow Berkshire to offer each client a price specifically calculated to interest the client in moving its business to Berkshire.

F.      The information belonging to Freeman that was misappropriated and retained by Seto is information of information that derives independent economic value from not being generally known and which Freeman took reasonable measures to keep secret.

G.      Both Berkshire and Seto misappropriated Freeman trade secrets because they knew or should have known that such information had been taken and retained by Seto by improper means without Freeman's express or implied consent.

**FREEMAN'S GOOD-FAITH EFFORTS TO AVOID JUDICIAL INTERVENTION**

81.      On or about March 19, 2018, counsel for Freeman sent a cease and desist letter to Seto and, separately, counsel for Berkshire, informing them of Seto and Berkshire's breaches of contract and violations of law, as described herein. (See, Ex. G).

82.     Notwithstanding Freeman's counsel putting Seto on notice of his faithless actions and his various violations in connection with his employment at Freeman, Seto subsequently doubled down and again, without authorization, accessed Freeman's highly confidential and proprietary Salesforce database the following week.

83.     This was not an isolated incident; since resigning from Freeman, Seto has been regularly logging into to Freeman's Salesforce account, to which he was granted access *only* in connection with his employment at Freeman, in order to illegally access Freeman's confidential and proprietary information concerning its clients, prospects, confidential client notes for use at his new employer, Berkshire.

84.     On March 23, 2018, counsel for Seto and Berkshire wrote a reply letter to counsel for Freeman. (See, Ex. H). Revealingly, this letter fails to deny that Seto continues to possess confidential information belonging to Freeman as well as fails to deny that it has provided no representation regarding whether Seto possesses and disclosed such confidential and highly sensitive information to Berkshire that Seto learned of and acquired *solely* as a consequence of his employment and Partnership with Freeman.

85.     Nonetheless, Seto never returned the sensitive and confidential information of Freeman that he possessed.

86.     Seto continues to possess information belonging to Freeman, including documents and information containing Freeman trade secrets, all of which is used in connection with Freeman's services that are offered nationally and globally.

87.     Freeman has not authorized Seto's possession of this information, nor has Freeman consented to his use of the information.

88.     Instead, Seto is retaining and using that information to compete with and/or to otherwise harm Freeman.

89.     As a consequence of his actions, Seto has, among other things, acquired Freeman's trade secrets by improper means in violation of his agreements with Freeman and in violation of the DTSA.

<u>**FREEMAN'S IRREPARABLE INJURY**</u>

90.     The proprietary information and trade secrets that Seto and Berkshire misappropriated from Freeman are extremely valuable, took a great deal of time and money to generate, and derive much of their value from their secret status.

91.     Freeman requires injunctive relief to enjoin Seto and Berkshire from violating or participating in or benefiting from Seto's violations of his contractual and fiduciary duties not to disclose or use Freeman's confidential information and not to interfere in Freeman's contractual or business relationships with its customers or its employees.

92.     That Seto is working for Berkshire creates a tremendous likelihood of immediate irreparable harm, which can only be remedied by providing injunctive relief to reasonably protect Freeman's legitimate business interests.

93.     Upon information and belief, Seto and Berkshire have used and will continue to use confidential information and trade secrets misappropriated from Freeman to solicit Freeman's clients for Berkshire's services and to divert business from Freeman to Berkshire.

94.     Seto's and Berkshire's actions have damaged and will continue to damage Freeman's client relationships, to degrade the value of Freeman's confidential information and trade secrets, and to interfere with Freeman's business operations and employee relationships--all of which are irreparable injuries for which money damages alone are inadequate.

95.     Freeman's agreements with Seto provide Freeman with a narrowly tailored and reasonable restraint so as to provide Freeman with an opportunity to salvage and retain those Freeman clients with whom Seto developed significant business relationships.  In other words, the agreed-upon timeframe provides Freeman a reasonable window of opportunity to protect its legitimate business interests and recapture its good will.

96.     Equally problematic is that Seto's knowledge of Freeman's confidential and proprietary information creates an unacceptable risk of irreparable harm to Freeman. Defendants cannot be trusted to comply with the non-disclosure and non-solicitation covenants in the agreements.

97.     There already is good reason to believe that Seto has absconded with Freeman's confidential and proprietary information and transferred it to Berkshire.

98.     Although the exigent circumstances of Seto's resignation require Freeman to act now in seeking injunctive relief, it will be conducting a more thorough forensic examination of the available electronic evidence, and it is seeking expedited discovery as against Defendants Berkshire and Seto to this end.

99.     Seto's violation of his covenants is particularly troubling because he had broad access to almost every aspect of Freeman's financial services business.  This included Freeman's confidential databases including, but not limited to, the Salesforce Database, the FinTech Database and the Allocator Database, as well as Freeman's strategies related thereto, marketing plans, and client data.

100.    If the Court should refuse to enforce the narrowly tailored covenants designed to protect Freeman's legitimate business interests, it will send an unmistakable message to other Freeman Partners and employees that they, too, can violate their restrictive covenants.

Ultimately, the investments in time and money that Freeman made to ensure its competitive edge will be irreparably lost to its competitors. Accordingly, Freeman respectfully requests injunctive relief.

101.    For the reasons set forth above, Freeman also requires immediate and expedited discovery to learn the full extent of Defendants' legal violations and the extent of the damages they have caused Freeman.

# CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Against Seto)

102.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

103.    By agreeing to be bound by the Agreements, Seto agreed to restrictions on solicitation and prohibitions on using or disclosing Freeman's confidential and proprietary information to unfairly compete with Freeman and solicit away its client and business.

104.    By his aforesaid actions, Seto has breached his contractual obligations with Freeman.

105.    As a consequence of Seto's breach of his obligations, Freeman has been injured, and has suffered and will continue to suffer substantial harm in an amount to be determined at trial and is entitled to injunctive relief.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Seto)

106.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

107.    As a Partner of Freeman, Seto owed a fiduciary duty to Plaintiffs to refrain from acting in a manner that was contrary to Plaintiffs' best interests, and to refrain from using confidential, proprietary and trade secret information procured during his employment with Plaintiffs for any purpose other than for the benefit of Plaintiffs, and to not use said information for his own pecuniary gain.

108.     Defendant was and remains under a fiduciary duty both to keep Plaintiffs' confidential information confidential and to not use, exploit or divert such information on behalf of himself or others or to use it for the benefit of anyone other than Plaintiffs.

109.     Defendant breached this obligation by misappropriating Plaintiffs' trade secrets and then using said information to benefit himself at Plaintiffs' expense.

110.     Defendant's actions have caused or threaten to cause irreparable harm to Plaintiffs, including but not limited to the injury to its goodwill, reputation, customer relationships, competitive advantage, revenues and profits which are impossible to accurately and fully calculate.

111.     As such, Plaintiffs have no adequate remedy at law.

112.     As a direct and proximate result of the wrongful acts of Defendant, which were willful, wanton and malicious, Plaintiffs have been injured financially and will incur further damages in an amount to be proven at trial.

113.     Plaintiffs are therefore entitled to punitive damages.

114.     As a direct consequence of Defendant's misappropriation, Plaintiffs are entitled to preliminary and permanent injunctive relief, enjoining Defendant, and all those acting in concert or participation with him, from further accessing, using or disclosing Plaintiffs' trade secrets, or otherwise providing services to any of the customers identified in the documentation Defendant misappropriated from Plaintiffs.

### THIRD CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Berkshire)

115.     Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

116. As a Partner of Freeman, Seto owed a fiduciary duty to Plaintiffs to refrain from acting in a manner that was contrary to Plaintiffs' best interests, and to refrain from using confidential, proprietary and trade secret information procured during his employment with Plaintiffs for any purpose other than for the benefit of Plaintiffs, and to not use said information for his own pecuniary gain.

117. Seto was and remains under a fiduciary duty both to keep Plaintiffs' confidential information confidential and to not use, exploit or divert such information on behalf of himself or others or to use it for the benefit of anyone other than Plaintiffs.

118. Seto breached this obligation by misappropriating Plaintiffs' trade secrets and then using said information to benefit himself and Berkshire at Plaintiffs' expense.

119. Berkshire knowingly and deliberately encouraged, enticed, aided and abetted Seto to breach his fiduciary duties to Freeman.

120. As a result of Berkshire's acts, Freeman has suffered and will continue to suffer irreparable harm to Plaintiffs, including but not limited to the injury to its goodwill, reputation, customer relationships, competitive advantage, revenues and profits which are impossible to accurately and fully calculate, and Berkshire continues to benefit from their and Seto's wrongful acts, all to Freeman's injury and detriment.

<u>FOURTH CAUSE OF ACTION</u>
**Breach of Duty of Loyalty/Faithless Servant**
**(Against Seto)**

121. Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

122. Seto was employed by Freeman in a position of trust and confidence.

123. Both during and after his employment with Freeman, Seto owed Freeman a common law duty of loyalty. By virtue of these duties, Seto was and is prohibited from acting in a disloyal manner, or in any way inconsistent with the employment relationship.

124. By virtue of his employment with Freeman, Seto owed Freeman the utmost duty of loyalty, including but not limited to a duty not to use the confidential information and trade secrets Freeman entrusted to him in competition with Freeman, and not to use Freeman's time, resources or facilities for his own benefit.

125. Seto was also bound not to harm Freeman's business and/or benefit one of Freeman's competitors by soliciting clients and employees to leave Freeman.

126. By his actions, including those described above, Seto has violated his duty of loyalty to Freeman.

127. As a direct and proximate result of Seto's actions, Freeman has suffered and continues to suffer substantial and irreparable damages.

128. As such, Freeman is entitled to damages, in an amount to be determined at trial, including the disgorgement of all Defendant's compensation, including compensation received from Plaintiffs during his periods of disloyalty, without regard to whether Freeman suffered any damages by reason of Seto's faithless conduct.

129. Because the damages that will flow from Seto's faithless acts are irreparable, Freeman is entitled to preliminary and permanent injunctive relief, enjoining Defendant, and all those acting in concert or participation with him, from further accessing, using or disclosing Freeman's trade secrets, or otherwise providing services to any of the customers identified in the documentation Seto misappropriated from Plaintiffs.

## FIFTH CAUSE OF ACTION
### Unfair Competition
### (Against All Defendants)

130.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

131.    Defendants have engaged in unfair competition and violated industry standards and Freeman is entitled to damages and interest in an amount as the proof at trial may warrant as a result of their conduct, together with punitive damages in the amount of $5,000,000 or such greater amount as proof at trial may warrant.

## SIXTH CAUSE OF ACTION
### Misappropriation of Confidential Information and Trade Secrets
### (Against all Defendants)

132.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

133.    Freeman entrusted its former employee Seto with access to its confidential information and trade secrets, including but not limited to the identities, preferences, pricing, purchasing patterns, and strategies of Freeman's actual and potential clients, Freeman's existing and planned products, marketing strategies, pricing, and cost structures, as well as confidential personnel information regarding Freeman's employees.

134.    Freeman's confidential client information is non-public and the result of Freeman's expenditure of substantial resources to acquire and compile.

135.    By the actions complained of herein, Seto misappropriated and used on his own behalf and on behalf of Berkshire, Freeman's confidential information and trade secrets.

136.    Seto acted with Berkshire's knowledge and encouragement and Berkshire has ratified his actions.

137.    Seto knew or should have known that the Freeman information he misappropriated constitutes confidential information and trade secrets.

138.    As a result of Seto and Berkshire's conduct, Freeman has suffered and will continue to suffer substantial harm in an amount to be determined at trial and is entitled to injunctive relief.

**SEVENTH CAUSE OF ACTION**
**Violations of Defend Trade Secrets Act of 2016, 18 U.S.C. §1836(b)(1)**
**(Against all Defendants)**

139.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully restated herein.

140.    Defendants' actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

141.    Defendants acquired and/or possess confidential and proprietary information belonging to Plaintiffs, including financial, business, customer and strategic information that constitute trade secrets.

142.    Such information is used in connection with Plaintiffs' services, which are offered across the country and throughout the world and is information that Freeman otherwise derives independent economic value from not being generally known and which Freeman took reasonable measures to keep secret.

143.    Plaintiffs have taken reasonable measures to keep its proprietary information secret, including by, requiring employees to sign confidentiality provisions and acknowledgements, and having in place policies restricting use of Company information.

144.    Seto was subject to provisions designed to protect the proprietary and confidentiality nature of certain information belonging to Plaintiffs, that required that he maintain the confidentiality of the information and prohibited him from using such information

other than as necessary in the course of performing his duties for the Company and as authorized by the Company.

145.     The information, of which Defendant possesses on his personal email accounts and potentially other computer hard drives, backup drives and/or cloud drives, derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

146.     Defendants knew or should have known that this information contained trade secrets belonging to Plaintiffs and had been taken and retained by Seto by improper means without Freeman's express or implied consent.

147.     Upon information and belief, Defendants are retaining and using that information to compete with and/or to otherwise harm Plaintiffs.

148.     Defendants' retention of Plaintiffs' trade secrets and confidential information violates the Partnership Agreement and NDA.

149.     Plaintiffs did not consent to Defendants use of the information.

150.     Defendant's conduct constitutes knowing, willful, and malicious misappropriation.

151.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendants will cause further irreparable injury to Plaintiffs.

152.     Plaintiffs is entitled to injunctive relief enjoining Defendants, its agents, and all persons acting in concert or participation with them, from engaging in any further use of Plaintiffs' proprietary and confidential information, requiring them to turn over any and all

copies of such information, wherever located, to Plaintiffs, and requiring they certify to the Court that they have permanently deleted or destroyed all copies of such information that they created that are not capable of being turned over due to the fact that they are located in cloud storage.

153.    As a result of Defendants' actions, Plaintiffs have suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(Against Defendant Seto)**

154.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

155.    Freeman's computer system is used in interstate commerce and communication.

156.    On one or more occasions, Seto knowingly and with intent to defraud accessed Freeman's computer system and obtained for himself a copy of confidential and proprietary information belonging to Freeman, including but not limited to Salesforce client reports.

157.    Upon information and belief, as of the date Seto so accessed Freeman's computer system, Seto knew but failed to disclose to Freeman that he intended to resign his employment and compete with Freeman in the near future.

158.    In so accessing the Freeman computer system, Seto acted outside the scope of his employment with Freeman and intentionally accessed Freeman's computer system without authorization or in excess of his authorization to do so.

159.    Seto's conduct has caused damage and loss to Freeman within the meaning of 18 U.S.C. § 1030 in an amount of more than $5,000, including but not limited to losses sustained in investigating, responding to and taking remedial steps regarding Seto's actions.

160.     By reason of Seto's actions, Freeman has been damaged in an amount to be determined at trial and is entitled to injunctive relief.

## NINTH CAUSE OF ACTION
### Tortious Interference with Contract and Advantageous Business Relations
**(All Defendants)**

161.     Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

162.     By their aforesaid actions, Defendants have intentionally, maliciously and without justification interfered in and induced the breach of Freeman's current and prospective contractual and/or business relationships with clients.

163.     As a result of the aforesaid wrongful actions of Defendants, Freeman has been injured, for which it is entitled to recover damages and interest in an amount which the proof at trial may show, together with punitive damages in the amount of $5,000,000 or such greater amount as the proof at trial may warrant.

## TENTH CAUSE OF ACTION
### Conversion
**(All Defendants)**

164.     Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

165.     Seto and Berkshire have converted property belonging to Freeman without legal justification or privilege, including but not limited to confidential information about Freeman's products, services, clients and prospects.

166.     As a result of Seto and Berkshire's misconduct, Freeman has suffered and will continue to suffer substantial and irreparable harm.

## ELEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against All Defendants)

167. Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

168. Defendants have unjustly profited at Plaintiffs' expense from Seto's misappropriation and use of Plaintiffs' trade secrets and confidential information.

169. Plaintiffs are also entitled to disgorge Defendants of the profits they unjustly gained at Plaintiffs' expense.

## TWELFTH CAUSE OF ACTION
### (Temporary and Permanent Injunction)

170. Plaintiffs repeat, reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth at length herein.

171. Freeman will suffer irreparable injury if Defendants are not enjoined from: (i) using and disclosing Freeman's confidential and proprietary information, (ii) interfering with Freeman's client relationships, (iii) violating the Partnership Agreement and (iv) raiding Freeman's clients.

172. Money damages would be inadequate to fully compensate Freeman for the incalculable loss of its confidential information, competitive edge, good will, client, business and employee relationships, and an amount of future profits that is impossible to determine, that would result from the continued wrongful acts of Defendants.

173. Freeman is therefore entitled to a temporary and permanent injunction prohibiting Defendants' illegal conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A. Enter a preliminary injunction and, after trial, enter a permanent injunction, ordering the Defendants to return to Freeman, and not to use, copy, disseminate, disclose, or provide access to, any information, documents, databases, or files that Seto obtained by virtue of his employment with Freeman regarding Freeman or its services, contracts, clients or prospects;

B. Enter a preliminary injunction and, after trial, enter a permanent injunction, enjoining Berkshire and enjoining Seto for a period of two (2) years from directly or indirectly soliciting any of Freeman's clients or employees;

C. Enter a preliminary injunction and, after trial, enter a permanent injunction, enjoining Berkshire from employing Seto, and enjoining Seto from performing any services for Berkshire, for a period of two (2) years in order to prevent what would otherwise be Seto's inevitable disclosure of Freeman's confidential information and trade secrets to Berkshire;

D. Enter a preliminary injunction and, after trial, enter a permanent injunction, enjoining Berkshire from employing any former Freeman employee;

E. Enter an order that any and all moneys or profits Seto or Berkshire have received or will receive flowing from their wrongful conduct described herein be held in constructive trust for Freeman;

F. Enter judgment in Freeman's favor and against each defendant for Freeman's compensatory damages in an amount yet to be determined but in excess of $75,000 on Freeman's First through Eighth Causes of Action;

G. Enter judgment in Freeman's favor and against each defendant for punitive damages, reasonable attorneys' fees, interest and costs, and

H. Grant such other or further relief in favor of Freeman as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and the extent permitted by law, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: April 11, 2018
      New York, New York

Respectfully submitted,

**SACK & SACK, LLP**

*/s/ Jonathan Sack*
By:_____
      Jonathan Sack, Esq.
      *Attorneys for Plaintiffs*
      70 East 55th Street, 10th Floor
      New York, New York 10022
      Tel.: (212) 702-9000

**VERIFICATION**

State of New York    }

                   } ss.:

County of New York   }

ERIC WEBER, being duly sworn, deposes and says:

I am the CEO at Freeman.  I have read the Complaint and know the contents thereof.  The same

are true to my knowledge, except as to matters therein stated to be alleged on information and

belief and as to those matters I believe them to be true.

ERIC WEBER

Sworn to before me this 6Th

day of April, 2018.

NOTARY PUBLIC

CAROL H. FOX
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FO4976291
Qualified in Queens County
My Commission Expires January 14, 2019